**Linda ALLINDER, Plaintiff–Appellant,**

v.

**INTER–CITY PRODUCTS CORPORATION (USA), Robert Henningsen, Defendants–Appellees.**

No. 97–5909.

United States Court of Appeals, Sixth Circuit.

Argued June 18, 1998.

Decided Aug. 10, 1998.

James L. Harris (argued and briefed), Nashville, Tennessee, for Plaintiff–Appellant.

Mark H. Floyd, Bynum E. Tudor, III (argued and briefed), Floyd & Tudor, Nashville, Tennessee, for Defendants–Appellees.

Before: MOORE, CLAY, and GILMAN, Circuit Judges.

GILMAN, Circuit Judge.

Linda Allinder sued her former employer, Inter–City Products Corporation, and its Vice President of Human Resources, Robert Henningsen (collectively "ICP"), for alleged violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). She specifically claimed that ICP violated 29 U.S.C. § 1132(c) (refusal to supply requested information) and §§ 1104(a)(1) and 1106(b)(2) (breach of fiduciary duty). The essence of Allinder's suit concerned ICP's refusal to complete a form necessary for her to file a long-term disability insurance claim after she suffered a debilitating toxic reaction to pesticides sprayed in her work area. Although she was eventually paid in full the amount of benefits due under the policy, Allinder sought compensatory and punitive damages based on the allegedly intentional misrepre-

sentations made by ICP in order to delay such payment.

While sympathetic to Allinder's plight, the district court nonetheless granted summary judgment in favor of ICP. The court's reasoning was twofold. First, the court concluded that ERISA's document-disclosure provisions do not cover claim forms. Second, relying upon this court's decision in *Tassinare v. American Nat. Ins. Co.*, 32 F.3d 220 (6th Cir.1994), the district court held that Allinder could not make out a claim for breach of fiduciary duty because "fiduciary liability under ERISA arises in favor of the plan itself, and ... plan participants may not seek to recover in an individual capacity." For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. ICP's Long–Term Disability Insurance Policy

Allinder began work as a computer systems analyst at ICP's Lovergne, Tennessee facility in May of 1986. As is standard in the employment setting, ICP offered its employees a package of benefits, including a company-sponsored long-term disability insurance policy ("the policy"). Allinder elected to enroll in the policy when she assumed her position at ICP. The terms and conditions of the policy were contained in an insurance contract signed by ICP and Life Insurance Company of North America ("insurance company").

Under the terms of the policy, an eligible employee was considered insured at the conclusion of an initial twelve-month waiting period. In order to fall within the class of eligible employees, the employee had to be in active service and regularly work a minimum of thirty hours a week. An employee was considered to be in active service if he or she performed "all of the regular duties of his work" during scheduled work days. The policy did provide one exception: employees did not have to meet the eligibility requirements if they were unable to work due to a "total disability."

The term "total disability" was defined by the policy as one where, "because of injury or sickness, [an employee] is unable to perform all the essential duties of his occupation." The policy further provided that insured employees were entitled to receive payment of long-term disability benefits after they had suffered from a "total disability" for more than six months. According to the section of the policy titled "Long Term Disability Benefits," the insurance company was obligated to make monthly payments of disability benefits once it received proof that "the employee became Totally Disabled *while insured.*" (emphasis added). Insured employees were thus entitled to disability benefits once they became disabled, regardless of when they filed a claim for benefits. The policy concluded by stating that the insurance company would deal solely with ICP, which was deemed the representative for the employee, and that any action ICP took in regard to the administration of the plan was binding on the employee.

### B. The Disability Claim

ICP hired a local pest-control company in March of 1990 to spray for termites in the work area used by Allinder. Shortly after the spraying, Allinder began to experience a number of adverse symptoms, including itching, severe shortness of breath, extreme fatigue, pain, fever, and difficulty walking. After reporting these symptoms to her supervisor, Allinder left work and remained at home for several days. When she returned to work, Allinder requested that she be moved to another area in the building that had not been sprayed with pesticides. ICP accommodated Allinder's request and moved her to an alternate work area in its facility. Allinder's symptoms apparently subsided once she was transferred to the new work area. On April 10, 1990, however, Allinder's immediate supervisor, Rick Zorn, ordered Allinder to return to her original work area. Her symptoms reappeared upon her return. Allinder again requested and was allowed to go back to the alternate work area to carry out her job duties.

In early June of 1990, Zorn again forced Allinder to return to her original work area. Upon her return, Allinder began to suffer even more severe symptoms than she had

earlier experienced. On June 19, 1990, Allinder's condition worsened to the point that she experienced uncontrollable tremors in her hands and legs, including one episode where her legs involuntarily jerked for four hours. Allinder was rushed to nearby Baptist Hospital's emergency room, where she was diagnosed as suffering from a toxic reaction to the pesticide sprayed by the pest-control company. Allinder's treating physician later diagnosed her as having suffered nerve damage from her exposure to the pesticide. Allinder remained away from work for the remainder of June because of her illness.

Allinder met with members of ICP's management in July to discuss her medical condition. At this meeting, Allinder presented a letter from her physician stating that she should not work in an area where pesticides have been applied or, alternatively, that she should be allowed to work at home. At the conclusion of this meeting, Allinder was asked whether she was resigning her job. Allinder responded that she intended to continue to work for ICP after she recovered from her illness. ICP nonetheless terminated Allinder's employment on August 24, 1990 due to her failure to report to work while she was seeking treatment for her illness. At the time she was fired, Allinder was less than a month away from being entitled to receive payment of long-term disability benefits.

On November 14, 1991, Allinder requested that ICP fill out its portion of the long-term disability claim form and submit it to the insurance company so that she could begin receiving payments of disability benefits. This claim form is a two-sided document. The front of the document provides questions for the employee to answer, while the back is to be completed by ICP. In a letter dated January 17, 1992, ICP's in-house counsel informed Allinder that the company would not fill out its portion of the form because she failed to "me[e]t the threshold requirement of active employee status at the time she made a claim for LTD (Long Term Disability) benefits."

This representation, as conceded by ICP at oral argument, was incorrect. According to the policy, the relevant date for determining whether insured employees were entitled to disability benefits was when they first became disabled, not when they made a claim for benefits. Because Allinder was insured at the time she first became disabled, she was entitled to disability benefits. The letter continued by informing Allinder that "the determination of active employee status is within the exclusive province of the Company. Thus, the submission of a LTD application form and setting in motion the decision-making process as to the merits of her claim is inappropriate." Allinder believed ICP's statements and decided not to pursue her request any further at that time.

Prompted by information she later learned while attending a public health law course, Allinder reconsidered her earlier decision and submitted another request to ICP to fill out its portion of the long-term disability claim form. This request was dated December 30, 1993. ICP again denied Allinder's request for the same reasons it had given earlier. Allinder then contacted the insurance company to seek its aid in resolving the matter. In a letter dated January 20, 1994, an insurance-company representative responded to Allinder's request by noting that "in order to file a claim for Long Term Disability benefits, we require that you provide proof of loss by submitting the appropriate form, *i.e.*, . . . the Group Long Term Disability form to be completed by both you and your employer."

Allinder then retained the services of an attorney. In a letter dated March 27, 1995, Allinder's attorney requested that ICP provide copies of the portions of the insurance policy which indicated that Allinder was not entitled to long-term disability benefits. The defendant Henningsen responded by sending Allinder a copy of the section of the insurance policy titled "Eligibility for Employee Insurance." This section of the policy, however, only delineates the requirements for disability-insurance coverage. It does not address under what conditions benefits are payable.

Faced with ICP's recalcitrance, Allinder's attorney negotiated a side agreement with the insurance company. According to the agreement, Allinder would fill out ICP's por-

tion of the claim form and submit the "completed" form to the insurance company to process her claim. After Allinder actually submitted the "completed" form, the insurance company in November of 1995 provided her with a lump-sum payment of the long-term disability benefits to which she was entitled under the policy.

Even though she eventually obtained her disability benefits, Allinder remained perturbed with the manner in which ICP had attempted to prevent her from receiving what she was due. Allinder consequently filed suit in a Tennessee state court against ICP, alleging conversion, tortuous interference with contractual rights, and misrepresentation in seeking to deprive Allinder of her disability benefits. ICP removed the case to federal court on the basis of a federal question under 28 U.S.C. § 1331. It was subsequently dismissed without prejudice because all of Allinder's state law claims were preempted by ERISA. Allinder then refiled the action in federal court in September of 1996, alleging that ICP's conduct violated ERISA provisions 29 U.S.C. §§ 1132(c), 1104(a)(1), and 1106(b)(2). Allinder pursued her ERISA claims under the civil enforcement provisions contained in § 1132(a)(3) and § 1132(c). In her complaint, Allinder requested only two forms of relief: compensatory damages in the amount of $300,000, and punitive damages in the amount of $300,000.

ICP filed a motion for judgment on the pleadings, contending that (1) Allinder could not make out a cause of action under § 1132(c) because claim forms do not fall within its provisions, (2) Allinder was not entitled to compensatory or punitive damages under § 1132(a)(3) for a violation of § 1104 and § 1106 pursuant to the Supreme Court's decision in *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), and (3) even if she was entitled to some form of monetary relief, Allinder's claims were time-barred. In her memorandum in opposition to ICP's motion, Allinder conceded ICP's second point about the type of damages available under § 1132(a)(3), but maintained nevertheless that she had established a claim for relief under § 1132(c). Because Allinder attached an affidavit in sup-

port of her memorandum in opposition, the district court correctly treated ICP's motion as one for summary judgment. *See Security Ins. Co. of Hartford v. Tucker & Assoc., Inc.*, 64 F.3d 1001, 1005 (6th Cir.1995). After considering the merits of ICP's motion and Allinder's response, the district court entered summary judgment in favor of ICP. This timely appeal followed.

## II. ANALYSIS

### A. Standard of Review

We review a district court's order granting summary judgment *de novo*. *Terry Barr Sales Agency, Inc. v. All–Lock Co.*, 96 F.3d 174, 178 (6th Cir.1996). Like the district court, we must view the entire record in the light most favorable to the non-moving party, taking all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An entry of summary judgment can only be upheld if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).

### B. Failure to Fill Out a Claim Form

Allinder devotes much of her brief to the proposition that ICP violated § 1132(c) by failing to complete its portion of the long-term disability claim form. During the relevant time period, section 1132(c) provided in pertinent part as follows:

> Any administrator who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary ... within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c). The thrust of Allinder's argument is that claim forms are among the

information that § 1132(c) requires a plan administrator to furnish to plan participants. Section 1024(b)(4) requires plan administrators to provide the following information to plan participants:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or *other instruments under which the plan is established or operated.*

29 U.S.C. § 1024(b)(4) (emphasis added).

Allinder asserts that claim forms fall under § 1024(b)(4)'s provision for "other instruments" because claim forms are necessary to the day-to-day operation of ICP's long-term disability benefit plan. She specifically notes that the insurance company requires that ICP submit completed claim forms before the insurance company will process any disability benefit claims. Allinder would thus have us read the term "other instruments" to include any document that is used in the *day-to-day processing of claims* under an employee benefit plan. Employment records, medical records, identification cards, and other types of evidentiary and processing documents conceivably would also fall within Allinder's construction of the term "other instruments."

■ Allinder misconstrues the breadth of the term. According to the rule of *ejusdem generis,* when general words follow the enumeration of specific words in a statute, courts are to construe the general words in a manner that limits them to the same class of things enumerated by the preceding specific words. *See United States v. Faudman,* 640 F.2d 20, 23 (6th Cir.1981). "The rule [gives] effect to both the particular and the general words, by treating the particular words as indicating the class, and the general words as extending the provisions of the statute to everything embraced in that class, though not specifically named by the particular words." 2A SUTHERLAND STATUTORY CONSTRUCTION § 47.17 at 166 (4th ed.1984). With this understanding in mind, Allinder's suggested interpretation is not the correct one.

■ From the statute's enumeration of the specific terms "summary plan description," "plan description," "bargaining agreement," and "contract," it is apparent that "other instruments" was meant to refer to documents that provide or contain information *concerning the terms and conditions of the participant's policy.* In a similar vein, the general term "other instruments" is qualified by the phrase "under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). Section 1024(b)(4)'s reference to "other instruments" is thus properly limited to those class of documents which provide a plan participant with information concerning how the plan is *operated.* Claim forms contain none of these qualities. Instead, claim forms are simply documents used in the *ministerial day-to-day processing* of individual claims pursuant to other documents that determine the plan's operation.

Moreover, ERISA's legislative history indicates that Congress did not intend that claim forms be among the materials covered under § 1132(c). "The reporting and disclosure provisions of [ERISA] were intended specifically to insure that plan participants are able to obtain financial information about the plan, as well as information about the benefits which they are eligible to receive." *Arsenault v. Bell,* 724 F.Supp. 1064, 1066 (D.Mass.1989). In the House Report accompanying the passage of ERISA, Congress recognized

> a need for a more particularized form of reporting so that the individual participant knows exactly where he stands with respect to the plan—what benefits he may be entitled to, what circumstances may preclude him from obtaining benefits, what procedures he must follow to obtain benefits, and who are the persons to whom the management and investment of his plan funds have been entrusted.... [T]he safeguarding effect of the fiduciary responsibility section will operate efficiently only if fiduciaries are aware that the details of their dealings will be open to inspection, and that individual participants and beneficiaries will be armed with enough information to enforce their own rights as well as

the obligations owed by the fiduciary to the plan in general.

H.R. REP. No. 533, 93d Cong., 2d Sess. 11 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4649. From this legislative history, it is clear that Congress only intended § 1132(c) "to guarantee that plan participants have *access to the information* they need to protect their interests in the assets and funds being managed by the plan fiduciaries." *Arsenault,* 724 F.Supp. at 1066 (emphasis added). There is nothing in the legislative history to indicate that Congress drafted § 1132(c) to insure that plan fiduciaries faithfully execute their ministerial function of completing claim forms for individual plan participants.

Although this is an issue of first impression in this circuit, we note that every court that has considered the question has agreed that a plan participant may not invoke § 1132(c) to collect penalties from an administrator who fails to supply or complete claim forms. *See Arsenault,* 724 F.Supp. at 1065–67; *Clouatre v. Lockwood,* 593 F.Supp. 1136, 1140 (M.D.La.1984) (plaintiff's "request for benefits does not satisfy the request element that is needed to state a claim upon which relief can be granted under" § 1132(c)); *Wesley v. Monsanto Co.,* 554 F.Supp. 93, 98 (E.D.Mo.1982) ("claim forms are not among the documents specified in the statute."). Because the applicable statutory language, legislative history, and case law demonstrate that claim forms are not among the materials covered by § 1132(c), Allinder cannot make out a claim for a violation of § 1132(c). We therefore affirm the district court's granting of summary judgment in favor of ICP on this claim.

### C. Breach of Fiduciary Duty under §§ 1104 and 1106

■ One issue not addressed by either party concerns the district court's handling of whether Allinder can sue ICP in her individual capacity for the former's alleged violation of § 1104(a)(1) and § 1106(b)(2). The parties instead focus exclusively on the form of relief available under § 1132(a)(3) when there has been a showing of a breach of fiduciary duty under § 1104(a)(1) and

§ 1106(b)(2). Although we normally decide cases "on the narrow battlefield the parties have chosen," *Mertens v. Hewitt Assoc.,* 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), this preliminary question assumes greater importance in this case because the district court's decision rested on its resolution of the standing issue.

Section 1132(a)(3) is the third of "six carefully integrated civil enforcement provisions found in [§ 1132(a)]." *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). For the period of time relevant to this case, section 1132(a) read in its entirety as follows:

**(a) Persons empowered to bring a civil action.** A civil action may be brought—

(1) by a participant or beneficiary—

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

(4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title;

(5) except as otherwise provided in subsection (b) of this section, by the Secretary (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter; or

(6) by the Secretary to collect any civil penalty under subsection (i) of this section.

Section 1132(a)(1)(B)'s provisions concerning the recovery of benefits wrongfully denied

are not applicable in this case because Allinder eventually did receive the benefits she was entitled to under ICP's policy. If the insurance company had not made a lump-sum payment of benefits to Allinder, § 1132(a)(1)(B) would have provided her a viable avenue for relief.

Instead, Allinder claims that the alleged intentional misrepresentations made by ICP in refusing to complete the claim form constituted a violation of its fiduciary duties under ERISA—specifically, § 1104(a)(1) and § 1106(b)(2). These provisions read in pertinent part as follows:

### § 1104 Fiduciary Duties

**(a) Prudent man standard of care**

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.

### § 1106 Prohibited Transactions

**(b) Transactions between plan and fiduciary**

A fiduciary with respect to a plan shall not—

. . . .

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries.

The district court, however, did not reach the merits of Allinder's breach of fiduciary duty claim. Instead, it relied on *Tassinare v. American Nat. Ins. Co.*, 32 F.3d 220 (6th Cir.1994), for the proposition that the fiduciary duties imposed by ERISA on administrators runs only to the plan itself, as opposed to the individual plan participants. *Id.* at 222. Because Allinder sought to recover damages from ICP for her own personal benefit, the district court held that she failed to state a claim for a breach of fiduciary duty under § 1132(a)(3).

Such reliance upon *Tassinare*, however, is misplaced because of the Supreme Court's subsequent decision in *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). In *Varity*, the Supreme Court squarely held that § 1132(a)(3) is "broad enough to cover individual relief for breach of a fiduciary obligation." *Id.* at 1076. Accordingly, individual plan participants can now bring suit under § 1132(a)(3) in their individual capacity. *Id.* The district court therefore erred in dismissing Allinder's breach of fiduciary duty claim on the basis that she brought it in her individual capacity. This error does not ultimately inure to Allinder's benefit, however, because her claim for compensatory and punitive damages under § 1132(a)(3)(B)'s provisions for "other appropriate equitable relief"is not viable as a matter of law (see subsection D. below).

### D. Compensatory and Punitive Damages Under § 1132(a)(3)

■ Allinder argues that she is entitled to compensatory and punitive damages under § 1132(a)(3) for ICP's purported breach of fiduciary duty. ICP contends that Allinder has failed to preserve this question for appeal because she conceded in the district court that she was not entitled to such damages. Allinder claimed at oral argument before this court that she did not concede this issue below, but simply failed to argue its

merits. Although as a general rule this court will not consider an issue not passed upon below, we have chosen to address this claim because it concerns a purely legal question whose resolution is clear and indisputable. *See Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (finding that "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeal, to be exercised on the facts of the individual cases.").

Allinder asserts that compensatory damages fall within the term "equitable relief" because such relief traditionally has been allowed in courts of equity where the claim involves a breach of trust. For support, Allinder relies upon Justice Brennan's concurring opinion in *Massachusetts Mut. Life Ins. Co. v. Russell,* where he noted that "while a given form of monetary relief may be unavailable under ERISA [when it would significantly conflict with some other aspect of the statutory scheme,] it cannot be withheld simply because a beneficiary's remedies under ERISA are denominated 'equitable.'"473 U.S. 134, 154 n. 10 (1985). Whatever persuasiveness Justice Brennan's opinion may once have had on this question, it has since been squarely rejected by the Supreme Court's decision in *Mertens v. Hewitt Assoc.,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). *Mertens* specifically held that § 1132(a)(3)'s reference to "equitable relief" was limited to the "remedy traditionally viewed as 'equitable,' such as injunction or restitution." *Id.* at 255, 113 S.Ct. 2063. Because money damages are "the classic form of *legal* relief," § 1132(a)(3) does not authorize suits for compensatory, much less punitive, damages. *Id.*

Accordingly, although Allinder may bring a claim for breach of fiduciary duty in her individual capacity, we nonetheless hold that the district court properly dismissed Allinder's action because the form of remedy sought is not available to her as a matter of law. *See City Management Corp. v. U.S. Chem. Co., Inc.,* 43 F.3d 244, 251 (6th Cir. 1994) (finding that this court may affirm on any grounds supported by the record, even though they may be different grounds than those relied upon by the district court).

## E. ICP's Motion for Sanctions

As a final housecleaning matter, we deny ICP's motion for sanctions brought under Rule 38 of the Federal Rules of Appellate Procedure. ICP contends that sanctions are appropriate, in part, because Allinder's "arguments concerning the interpretation of § 1132(c) constitute novel, stubborn legal arguments involving authority which is, at best, only marginally relevant to the issue in dispute, and which is, at worst, completely foreclosed by the controlling precedent of this Circuit." Moreover, ICP argues that Allinder's position with respect to the form of relief that is available under § 1132(a)(3) "represents an insistence on litigating a question in the face of controlling precedents which removed every colorable basis in law for Plaintiff's position."

Rule 38 provides that "[i]f a court of appeals determines that an appeal is frivolous, it may … award just damages and single or double costs to the appellee." Thus the awarding of sanctions under Rule 38 is predicated upon a finding that (1) the appeal is frivolous, and (2) sanctions are appropriate. *See Depoister v. Mary M. Holloway Found.,* 36 F.3d 582, 588 (7th Cir.1994). Although the term "frivolous" is not subject to a ready-made definition, generally "[a]n appeal is frivolous when the result is obvious or when the appellant's argument is wholly without merit." *Id.* (quoting *Spiegel v. Continental Ill. Nat. Bank,* 790 F.2d 638, 650 (7th Cir.1986)). Sanctions are appropriate where "the appeal was prosecuted with no reasonable expectation of altering the district court's judgment and for purposes of delay or harassment or out of sheer obstinacy." *Reid v. United States,* 715 F.2d 1148, 1155 (7th Cir.1983).

Although we have rejected Allinder's argument concerning the proper interpretation of ERISA's document-disclosure provisions, we do not believe that her arguments were wholly without merit. Allinder did put forward a cognizable, albeit strained, interpretation of § 1024(b)(4) to support her position. ICP has also failed to present any

evidence, other than its conclusory statements, that Allinder pursued her appeal with a dilatory motive or in bad faith. Finally, we are troubled by ICP's attempt to punish Allinder when its own hands are not entirely clean in this matter. Indeed, but for the impediment that the *Mertens* decision placed on Allinder's ability to pursue her claim for monetary damages under § 1132(a)(3), the district court's grant of summary judgment for ICP on the fiduciary duty claim would have been inappropriate at this stage in the litigation.

### III. CONCLUSION

Many commentators have noted that the Supreme Court's 5–4 decision in *Mertens* has resulted in a "betrayal without a remedy" for employees who pursue ERISA claims beyond the simple recovery of benefits. *See* Jayne Elizabeth Zanglein, *Closing the Gap: Safeguarding Participants' Rights by Expanding the Federal Common Law of ERISA*, 72 WASH. U. L.Q. 671, 671 (1994) (noting that participants are "caught in the vortex of an ever-expanding preemptive black hole, unregulated by ERISA, and unprotected by state law.").

The outcome in this case lends support to such criticism. Allinder would have been entitled to monetary damages under the state-law claims she originally filed. These claims, however, were extinguished by ERISA's "ever-expanding preemptive black hole." Zanglein, *Closing the Gap*, 72 WASH. U. L.Q. at 674. ERISA, in turn, provides infertile soil for an employee to cultivate a meaningful remedy for anything beyond the recovery of basic benefits. Employees may seek monetary damages on behalf of the *plan* for an employer's breach of fiduciary duty. *See Russell*, 473 U.S. at 139–40, 105 S.Ct. 3085. They may not, however, seek similar relief for their own benefit when an employer breaches its fiduciary duty. *Mertens*, 508 U.S. at 258, 113 S.Ct. 2063. Instead, employees are left with the often-inadequate remedy of an injunction, imposition of a constructive trust, or the removal of the fiduciary. "In this way, the combination [of the employee's] state cause of action [being] preempted by ERISA even while ERISA denies him any

alternative remedy ... is disappointingly pernicious to the very goal and desires that motivated Congress to enact [ERISA] in the first place." *Sanson v. General Motors Corp.*, 966 F.2d 618, 625 (11th Cir.1992) (Birch, J., dissenting).

Constrained as we are by both ERISA's statutory provisions and the Supreme Court's construction of that language, this case provides no opportunity for us to redress the problems that employees face when pursuing a remedy under ERISA for an employer's or insurer's misdeeds beyond the recovery of the basic benefits to which they are entitled. Accordingly, we **AFFIRM** the judgment of the district court.