In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-1109

SHARON MONDRY,

*Plaintiff-Appellant*,

*v.*

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 06 C 320—**John C. Shabaz**, *Judge*.

ARGUED NOVEMBER 6, 2007—DECIDED MARCH 5, 2009

Before FLAUM, KANNE, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. When Sharon Mondry sought reimbursement from her workplace insurance plan for the speech therapy her son was receiving, she was advised that the therapy was not covered by the plan because it was "educational or training" and "not restorative." For the next sixteen months, Mondry repeatedly asked both the plan and claims administrators to supply her with the plan documents containing the

language on which the claims administrator had relied in denying her claim. When the relevant documents were finally produced, it became patently clear that the provisions of these documents were inconsistent with the governing language of the insurance plan and that the claims administrator had inappropriately denied Mondry's claim for reimbursement. Once the error was exposed, Mondry prevailed. Mondry then filed suit against both the plan and claims administrators under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), contending as relevant here that they had violated a statutory obligation to produce plan documents to her and misrepresented the terms of the plan to her in violation of their fiduciary duties. The district court dismissed these claims as against the claims administrator and entered summary judgment in favor of the plan administrator. We affirm in part and reverse in part.

## II.

Mondry worked for defendant American Family Mutual Insurance Company ("American Family") until September 2003. During her tenure with the company, Mondry participated in the AmeriPreferred PPO Plan (the "Plan"), a self-funded group health insurance plan that American Family offered to its employees. Mondry also enrolled her son Zev, who was born in 1999, as a beneficiary of the Plan. The governance and terms of the plan were set forth in a Summary Plan Description ("SPD"). The SPD identified American Family as the Plan admin-

istrator but indicated that American Family had contracted with defendant Connecticut General Life Insurance Company, a subsidiary of CIGNA Corporation and an affiliate of the CIGNA HealthCare (collectively, "CIGNA"), to handle the administration of claims for services pursuant to the Plan.

On the recommendation of his pediatrician, Zev began to receive speech therapy in July 2001. Initially, that therapy was provided to Zev through Wisconsin's Birth to Three program, a partially government-funded, early-intervention program for infants and toddlers with developmental delays and disabilities. As Zev approached his third birthday (at which time he would no longer be eligible to participate in the Birth to Three program), Mondry arranged for his therapy to continue at the Communication Development Center ("CDC"). When Mondry contacted American Family's Human Resources Department to ascertain the extent to which Zev's therapy would be covered by the Plan, she was directed to the company's internal website, where a copy of the SPD was posted. After reviewing the SPD, Mondry took Zev to his first speech therapy session at CDC on January 21, 2003 and to regular sessions thereafter. CDC submitted invoices to CIGNA seeking payment for the therapy.

On June 13, 2003, CIGNA's representative, Dr. Marsh Silberstein, wrote a letter to CDC, with a copy to Mondry, denying coverage for the speech therapy that Zev was receiving. In relevant part, the letter stated:

> Your [i.e. Mondry's] plan provides coverage for specified Covered Services which are medically necessary.

> After a review of the information submitted, we
> have determined that the requested services are not
> covered under the terms of your plan. This coverage
> decision was made based on the following:
>
> The information provided does not meet plan lan-
> guage for speech therapy per CIGNA guidelines.
> Patient has expressive language skills delay and
> auditory comprehension skills impairment. Speech
> therapy to address this delay is *educational or training*.
> Speech therapy is *not restorative*.
>
> Based on CIGNA's Benefit Resource Tools Guidelines-
> Speech Therapy.

R. 3 Ex. 1 (emphasis supplied).

Notably, one of the terms CIGNA used in its letter to
characterize Zev's speech therapy—"not restorative"—is
not found in the provisions of the Plan's SPD, and the
terms "educational" and "training" are not used in the
portion of the SPD dealing specifically with speech ther-
apy. The SPD indicates that speech therapy will be
covered so long as it is performed by a licensed or
certified therapist and is referred by a doctor, subject to
a maximum of thirty-five visits per injury or illness
unless more are deemed necessary by physician. R. 13
Ex. B at 17.[1] Moreover, as CIGNA's letter acknowledges,

---

[1] The words "education" and "training" are found elsewhere
in the SPD. Included among the SPD's list of expenses that are
not covered are "[c]harges for custodial services, education,

(continued...)

all claims against the Plan are subject to a general require-
ment, found in the SPD, that the treatment or services
provided to a Plan participant be "medically necessary."
By the terms of the SPD, treatment qualifies as "medically
necessary" when

> services and supplies are provided by a hospital,
> doctor, or other licensed medical provider to treat a
> covered illness or injury. The treatment must be
> appropriate for the symptoms or diagnosis, within the
> standards of acceptable medical practice, the most
> appropriate supply or level safe for the patient, and not
> solely for the convenience of the patient, doctor,
> hospital, or other licensed professional.

R. 13 Ex. B at 6. CIGNA's Benefit Interpretation Resource
Tool for Speech Therapy ("BIRT"), which was cited in its
letter to CDC and Mondry as the basis for CIGNA's

---

[1] (...continued)
training, or rest cures." R. 13 Ex. B at 33. It is not clear whether
the modifier "custodial" applies only to the term "services" or
to all of the terms that follow. The scope of this exclusion has not
been addressed by the parties on appeal. What is clear is that
this exclusion does not address speech therapy in particular. As
noted above, the SPD elsewhere specifically provides that
speech therapy is covered so long as it is recommended by a
physician and provided by an appropriate professional; no
exclusion is set forth for speech therapy that may be considered
"education" or "training." R. 13 Ex. B at 17. It appears that
CIGNA drew the terms "educational or training" and "non-
restorative" not from the SPD but from the Benefit Interpreta-
tion Resource Tool referenced below.

conclusion that Zev's speech therapy was not covered by the Plan, is not part of the SPD and was not posted on American Family's internal website as a Plan document.

In response to CIGNA's letter, Mondry on June 30, 2003, wrote to both CIGNA and to American Family's benefits coordinator, Ken Dvorak, expressing her wish to appeal the adverse determination. She also requested a complete copy of the governing Plan documents, explaining, "The document I was told to pull off the American Family Intranet site is a Summary Plan Description, and is incomplete." R. 3 Ex. 3.

Mondry's first request for additional documentation of the Plan terms went unanswered. CIGNA treated her letter solely as a notice of appeal, and a CIGNA appeals processor wrote to Mondry on July 11, 2003, acknowledging her letter as such. The letter explained that CIGNA had a two-level appeals process and that her request was considered a "first level appeal," and that a physician reviewer or designee who was not involved in the original benefits determination would review that determination and resolve her appeal within thirty days. R. 3 Ex. 3. The letter said nothing about Mondry's request for a complete copy of the Plan documents. American Family did not respond to the letter.

Dr. Patricia J. Loudis reviewed the case on CIGNA's behalf and upheld the denial of coverage for Zev's speech in a letter to Mondry dated July 23, 2003. Dr. Loudis set forth the following reasons for CIGNA's conclusion that Zev's speech therapy was not medically necessary:

• The information provided does not justify the necessity of speech therapy.

• The patient has Expressive Language delays.

• Notes show that the goals of therapy are to improve speech skills not fully developed.

• Speech therapy is *not restorative*.

• Speech therapy, which is *not restorative*, is not a covered expense per the patient's *specific plan provisions*.

• *Reference CIGNA Clinical Resource tool for Speech Therapy*.

R. 3 Ex. 4 (emphasis supplied). Notwithstanding Dr. Loudis's reference to "specific plan provisions" excluding speech therapy from expenses covered by American Family's Plan, the SPD in fact reflects that speech therapy generally *is* covered, and it contains no provision specifically conditioning coverage for speech therapy on the treatment being "restorative." And as with the BIRT mentioned in the June 13 letter denying Mondry's claim, the CIGNA Clinical Resource Tool for Speech Therapy ("CRT") mentioned by Loudis is not part of the SPD and was not posted on American Family's website as a Plan document.

On July 28, 2003, Mondry sent both CIGNA and American Family a second letter requesting "the total and complete copy of my Plan Documents." R. 3 Ex. 5. She noted that her first request for such documents had met with no response. By this time, Mondry had

engaged a public interest law firm, Advocacy and Benefits Counseling for Health, Inc. ("ABC"), to represent her. She indicated in her July 28 letter that CIGNA and American Family should copy that firm on subsequent correspondence.

Mondry subsequently accepted a voluntary lay-off from American Family pursuant to a severance agreement effective September 19, 2003. R. 51 Ex. 209. Mondry elected not to exercise her right under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") to purchase continued coverage under the Plan. Mondry's counsel has represented that she instead obtained insurance coverage for herself and her son Zev through Wisconsin's Badger Care, a state-sponsored program offering insurance to families with children. However, Mondry and her counsel continued their efforts to obtain reimbursement from the Plan for the speech therapy Zev had received prior to her departure from American Family and the cessation of her coverage under the AmeriPreferred Plan.

ABC attorney Jonathan Cope wrote to both CIGNA and American Family on Mondry's behalf on September 23, 2003. Cope noted that Mondry had yet to receive a complete set of the Plan documents underlying CIGNA's adverse determination in response to her previous requests, but instead had been referred to a website. Pointing out that the failure to provide Mondry with the Plan documents could result in statutory penalties, Cope requested that the documents Mondry had requested be provided to her within thirty days. He also asked that

if neither of the addressees was the Plan Administrator, that they forward his letter to the appropriate individual. R. 3 Ex. 6.

American Family responded to Cope's request in a letter dated October 16, 2003. Benefits Specialist Stacy McDaniel enclosed a copy of the SPD, and her letter stated that "This Summary Plan Description is the Plan document; we do not have a separate plan document." R. 3 Ex. 7. McDaniel added that the SPD had been available to Mondry in both paper and electronic form while she was an active employee of American Family.

Based on American Family's response, ABC attorney Bobby Peterson wrote to CIGNA's National Appeal Unit on October 30, 2003. Peterson noted that the only Plan document made available to Mondry was the SPD and that American Family had stated in its October 16 letter that there was no additional Plan document. Peterson asked CIGNA to confirm that the SPD was the legally binding Plan document. He also pointed out that Loudis's letter of July 23 referred to the CRT, which was not part of the SPD. "We are also requesting this Clinical Resource Tool, as well as any other information used to make your decision to deny these services, be sent to the undersigned." R. 3 Ex. 8.

CIGNA responded to Peterson's inquiry with a letter it faxed to Mondry's counsel on December 10, 2003. That letter enclosed a form for Mondry to sign to authorize the release of a copy of the Level One appeal file to her counsel. The letter also stated, "In regards to the request for the Summary Plan Description (SPD)[,] you

have to request this from your [previous] employer[;] per HIPAA guidelines and company policy we can[not] supply this item." R. 3 Ex. 9. The letter was silent as to Mondry's demand for a copy of the CRT.

On January 7, 2004, ABC attorney Peterson wrote another letter, this time to both CIGNA's National Appeals Unit and American Family. Peterson noted that Mondry's claim had been denied because it did not "'meet the plan language for speech therapy per CIGNA guidelines.'" R. 3 Ex. 11 (quoting June 13, 2003 Silberstein letter). Yet, neither CIGNA nor the Plan Administrator had provided to Mondry any Plan document with the language CIGNA had relied on to deny her claim; the sole document provided to Mondry, the SPD, contained no such language. "CIGNA also ignored several requests for the CIGNA Clinical Resource Tool for Speech Therapy and copies of all documents, records, and other information relevant to Ms. Mondry's appeal for benefits." *Id.* Peterson reiterated Mondry's demand for "a copy of the legally binding plan document in effect at the time the coverage was denied for this claim, a copy of the above-mentioned Clinical Resource Tool, as well as any other information used to make the decision to deny these services." *Id.*

When CIGNA thereafter provided a packet of materials to ABC, it did not include either the CRT or any other document containing the specific Plan language that CIGNA had relied upon in denying Mondry's claim, which prompted ABC's Peterson to direct another letter to CIGNA on January 28, 2004. Peterson noted that without

a copy of the specific provisions on which CIGNA's decision was based, Mondry could not prepare for a second-level appeal of that decision. Peterson argued that CIGNA's refusal to supply the specific Plan language underlying its decision was contrary to ERISA regulations, which entitle a plan participant to a copy of any internal rule, guideline, protocol, or other criterion relied upon in making an adverse benefit determination. R. 3 Ex. 12 (citing 29 C.F.R. § 2560.503-1(g)(v)(A) & (B)). He argued further that it was contrary to the SPD, which indicated that a Plan participant whose claim was denied had a right to know why it was denied and to obtain copies of any documents relating to that decision. "**For the fourth time**," the letter stated, "**we are requesting the plan language and documents used as the premise for the denial of coverage for Zev Mondry's speech therapy**." *Id.* (emphasis in original). Peterson concluded:

> To remind you of the specific information requested, we are enclosing our prior three requests for this language, as well as CIGNA's denial letter dated July 23, 2003 and two CIGNA printable reports dated June 10 and July 23, 2003. These documents refer to a CIGNA Clinical resource tool for Speech Therapy and to CIGNA's specific plan provisions. The words "Expressive Language Delays" are not found in the Summary Plan Document, and so they must exist somewhere in plan documents that have been with-held from Sharon Mondry and from ABC for Health, Inc., Sharon Mondry's authorized representative. We expect your prompt response.

*Id.* A copy of the letter was sent to American Family.

CIGNA sent ABC a fax on February 20, 2004, denying Mondry's request for a copy of the CRT. "[T]he CIGNA tool used is only available to internal CIGNA agencies," wrote Appeals Processor Kimberly Schmitz. R. 3 Ex. 13. Schmitz suggested that Mondry's counsel contact CIGNA's Intracorp Medical Review unit by telephone to discuss the matter. But subsequent efforts by ABC staff to resolve the matter by phone proved fruitless.

ABC turned to American Family for help in securing a copy of the CRT from CIGNA, but American Family fared no better. After ABC's Kathryn Kehoe contacted her, Rosalie Detmer, American Family's Assistant General Counsel, agreed to contact CIGNA and see if it would release a copy of the CRT. Detmer spoke with Carl Peterson at CIGNA on April 23, 2004. Peterson informed her that CIGNA considered the CRT "propriety," that it was "too big to send anyway," and that CIGNA therefore would not produce the document to either Mondry or American Family. R. 33 ¶ 7; R. 40 Ex. B; R. 65 at 23. Peterson also advised Detmer that a "summary" had already been sent to Mondry and "that is all that is legally required." R. 40 Ex. B; R. 65 at 23.[2] So far as the record reveals, Detmer and American Family accepted Peterson's response and made no further efforts to obtain the CRT or to clarify what CIGNA had relied upon in

---

[2]  It is not clear whether Peterson was referring to a summary of the CRT—in which case he was incorrect in representing that Mondry had already been provided with such a summary—or to the SPD.

denying Mondry's claim. Nor did Detmer contact Kehoe at ABC to report the result of her inquiry. Not until Kehoe telephoned her nearly one month later to follow up did Detmer advise her that CIGNA had refused to turn over a copy of the CRT. "I did what I agreed to do," Detmer would later testify. "I don't believe that I indicated to [Kehoe] that I would respond, simply that I would do what I said I had agreed to do." R. 65 at 28. Thereafter, ABC re-focused its attention on CIGNA.

ABC itself finally obtained a copy of the CRT in July 2004. CIGNA produced the CRT after John Pendergast, who was employed with CIGNA's National Appeals Unit, spoke by telephone with ABC legal intern Anne Berglund. According to Berglund, Pendergast told her that the CRT's provisions would be applied to Mondry's forthcoming Level Two appeal, and he agreed that disclosure of the CRT was required under ERISA. R. 3 Ex. 15. A copy of the CRT for Speech Therapy was faxed to ABC on July 2.

A review of the CRT revealed that it did not contain any of the key language that CIGNA had cited in denying Mondry's claim and sustaining the denial in her Level One appeal. The CRT did list the types of conditions for which CIGNA considered outpatient speech therapy to be "medically necessary," and it also identified the kinds of medical documentation that it would consider sufficient to support a finding of medical necessity. But the CRT did not employ any of the terminology that CIGNA had used in denying compensation to Mondry for Zev's speech therapy, including "expressive language delays," "educational or training," or "not restorative."

ABC's Berglund contacted CIGNA's Pendergast by letter on July 9, 2004, noting that the CRT lacked the language on which CIGNA had premised its denial of compensation to Mondry. ABC renewed its demand for any and all documents containing that language. R. 3 Ex. 16.

Pendergast declined ABC's request for additional documentation. On July 21, 2004, he left a voicemail for Berglund informing her that he had filed a Level Two on Mondry's behalf but that CIGNA would not be turning over any additional materials. Pendergast indicated that the Level Two review would be based "on the SPD, the plan contract, general service agreement, and [CIGNA's] criteria." R. 3 Ex. 17.

In the ensuing weeks, ABC continued to press CIGNA to produce additional information. By telephone and by mail, ABC again asked for any and all documents on which CIGNA had relied in disposing of Mondry's claims; based on Pendergast's July 21 voice message, ABC also demanded copies of the plan contract and the general service agreement. Initially, CIGNA produced to ABC a document entitled "CIGNA Healthcare Coverage Position" which related to speech therapy. But the effective date of that document was September 15, 2004—more than a year after Mondry's claim had been denied.

At last, ABC received by fax on October 5, 2004, a copy of the elusive BIRT—specifically, the "CIGNA Healthcare Benefit Interpretation Resource Tool for GSA 2001, Requested Service: Speech Therapy"—to which CIGNA had

alluded in its June 13, 2003 letter to Mondry denying her claim for Zev's speech therapy. The BIRT was revelatory in several respects. First, the BIRT contained a definition of "medically necessary" that was significantly different from that found in the SPD. R. 40 Ex. D at 1.[3] Second, the BIRT cited as the governing Plan document not the AmeriPreferred SPD, but rather the CIGNA Healthcare Group Service Agreement 2001. *Id.* at 3. Third, the BIRT listed fourteen types of outpatient speech therapy that would not be covered, including the following: (1) "[s]peech therapy that is *not restorative* in nature"; (2) [s]peech therapy that is considered custodial or *educational*"; (3) "[s]peech therapy that is intended to maintain speech communication"; (4) [s]peech therapy that is being used to improve speech skills that have not fully

---

[3] Whereas the SPD defines treatment and services as "medically necessary" when they are appropriate for the symptom or diagnosis, within the standards of acceptable medical practice, the most appropriate supply or level safe for the patient, and not solely for the convenience of the patient or provider, *see supra* at 5, the BIRT required that the provided services be "[n]o more than required to meet your basic health needs; and [c]onsistent with the diagnosis of the condition for which they are required; and [c]onsistent in type, frequency and duration of treatment with scientifically based guidelines as determined by medical research; and [r]equired for purposes other than [the] comfort and convenience of the patient or his Physicians; and [r]endered in the least intensive setting that is appropriate for the delivery of health care; and [o]f demonstrated medical value." R. 40 Ex. D at 1.

developed"; and (5) "[s]ervices, *training*, or *educational* therapy for learning disabilities, developmental delays, autism or mental retardation." *Id.* at 4 (emphasis ours).

After further correspondence and telephone communication between ABC and CIGNA, ABC concluded that CIGNA had relied upon the wrong criteria in denying Mondry's claim. ABC law clerk Molly Bushman set forth that view in a lengthy letter to Pendergast dated December 21, 2004. After summarizing much of the back and forth between ABC and CIGNA over the relevant Plan documents, Bushman noted that the BIRT's definition of medical necessity departed from the standard articulated in the SPD:

> The provisions of the BIRT are much more detailed and potentially restrictive than the provisions of the contract [i.e., the SPD]. There is absolutely no basis in the contract for the exclusion of "Expressive Language Delays" or for the requirement that the treatment be "restorative." According to your statement above [that the SPD is the controlling Plan document] and to the law, the definition of "medically necessary" in the Plan should apply to this claim, not the extraneous provisions of the BIRT. In addition, as Sharon Mondry has maintained, there is strong evidence in the medical documentation that the claim at issue was for services that were, in fact, restorative.

R. 3 Ex. 23 at 6.[4] Looking forward to Mondry's Level Two appeal, Bushman registered ABC's frustration with CIGNA's insistence that Mondry should frame her arguments based solely on the SPD rather than the BIRT or any of the additional documents that Mondry had sought from CIGNA, with or without success.

> While we agree that the BIRT is not contractually binding, it seems obvious that it was used to deny our client's claim. . . . [O]ur problem is that we do not know which standards will be applied to the medical facts. A voice mail you addressed to my colleague Anne Berglund on July 21, 2004 stated that we should argue our case based on the SPD, plan contract, general service agreement, and [CIGNA's] criteria. You recently stated to me that the SPD is the plan contract, we do not need the general service agreement, and that CIGNA's criteria (which I take to mean the [CRT] and the BIRT) are not contractually binding. Your inconsistencies do not end there. According to our phone conversation, you now want us to send our medical documents as soon as possible and schedule the hearing within two or

---

[4] This four-page letter appears to be mis-paginated. The second, third, and fourth pages of this letter are labeled pages five, six, and seven. There do not appear to be any pages missing from the copy in the record; and there is no apparent break in the text of the letter from pages one to five. To avoid confusion, however, we have cited the relevant pages of the letter as they are labeled in the record.

three weeks. You also expressed that you would make every accommodation to our client's schedule. In contrast, CIGNA has refused to send us the relevant documents, neglected to answer our phone calls and letters in a timely fashion, and basically protracted this process in a manner that could in no way be characterized as accommodating.

*Id.* at 6-7. Apparently, there was no further document production from CIGNA following this correspondence.

When CIGNA's appeals committee heard Mondry's Level Two Appeal several months later, it agreed that her claim had been denied improperly. The hearing took place by telephone conference call on April 13, 2005; Peterson and Bushman of ABC represented Mondry at that hearing. Two days later, CIGNA sent Mondry a letter informing her that she had prevailed in her appeal:

We are pleased to inform you that we have authorized coverage of the speech therapy services provided to Zev from January 21, 2003 through December 29, 2003. Your request has been authorized for the above listed services if you are enrolled and eligible for plan benefits on the date(s) of service. The requested services will be covered subject to Plan coverage and provisions at the time the service is rendered. We made our decision after reviewing your appeal and supporting documentation. We have made the necessary arrangements with the claims department to process the claims for payment by April 30, 2005.

R. 3 Ex. 25. The letter provided no further explanation for CIGNA's change in position.[5]

Ten months after the decision in Mondry's favor at the Level Two Appeal hearing, CIGNA reimbursed her for most but, according to Mondry, not all of the expenses she had incurred for Zev's speech therapy in 2003, before she left American Family's employ and opted not to accept continued COBRA coverage under American Family's Plan. Mondry asserts that she has yet to be reimbursed for $303.89 of the money she is out-of-pocket for the speech therapy Zev received in 2003.

Mondry subsequently filed suit against both American Family and CIGNA pursuant to ERISA's civil enforcement provision, 29 U.S.C. § 1132. In Count One of her complaint, Mondry alleged that in failing to timely respond to her multiple written requests for plan docu-

---

[5] Although the record contains a copy of CIGNA's internal notes regarding Mondry's appeal, those notes shed no light on CIGNA's rationale for deciding the appeal in Mondry's favor. The appeal notes reflect Mondry's argument that previous denials of her claim had indicated that speech therapy must be restorative in nature, which is a condition not found in the Plan language. The notes reflect Mondry's additional contention that the previous denials relied on the BIRT, a set of guidelines intended for managed care plans, which the AmeriPreferred Plan was not. But the notes contain no explanation for the appeals committee's decision, beyond noting that the decision was "[b]ased on all of the submitted information, benefit booklet and information provided during conference call." R. 51 Ex. 210.

ments, American Family and CIGNA had violated the obligation set forth in 29 U.S.C. § 1024(b)(4) to produce such documents and were liable for fines pursuant to 29 U.S.C. § 1132(c)(1)(B). In Count Two, Mondry alleged that American Family and CIGNA breached the fiduciary obligations they both owed to her under 29 U.S.C. § 1104(a)(1) to administer the AmeriPreferred Plan solely in the interest of Plan participants and beneficiaries, by misrepresenting the terms of the Plan and withholding from her information that she needed to pursue her Level Two appeal. Although Mondry asserted other, non-ERISA claims against the defendants, only the ERISA claims set forth in Counts One and Two of her complaint are at issue here. Mondry has not challenged the disposition of the other claims, which were dismissed for failure to state a claim on which relief could be granted.

The district court dismissed Counts One and Two as to CIGNA and later entered summary judgment in favor of American Family as to both claims. With respect to Count One, the court held that only American Family, as the plan administrator, bore the statutory obligation to produce plan documents under section 1024(b)(4), and so CIGNA could not be held liable for any violation of that statutory provision. *Mondry v. Am. Family Mut. Ins. Co.*, 2006 WL 2787867, at *3 (W.D. Wis. Sep. 26, 2006). The court initially denied in part American Family's request for summary judgment as to Count One and instead granted partial summary judgment to Mondry on that count. The court did agree with American Family that one of the documents that Mondry had demanded, the claims administration agreement between American Family and

CIGNA, did not constitute a governing plan document that American Family was statutorily obligated to produce. 2006 WL 3883601, at *8 (W.D. Wis. Nov. 21, 2006). But as to the other two documents Mondry had sought, the BIRT and CRT, the court, although it believed the question to be close, concluded that those documents qualified as plan documents whose production was required under section 1024(b)(4). *Id.*, at *9-*10. The court did not consider it to be a defense to liability that these documents were not in American Family's possession. *Id.* at *10. However, the court later reversed itself on reconsideration, relying on the letter that ABC had written to CIGNA on Mondry's behalf on December 21, 2004, in which ABC acknowledged that the BIRT was not contractually binding on CIGNA in its handling of Plan claims. The Court viewed that letter as an admission by Mondry that both the BIRT and CRT were merely advisory, internal guidelines that CIGNA was not obligated to use in evaluating benefit claims and consequently were not documents that established or governed the Plan. Consequently, American Family had no obligation to produce those documents to Mondry under section 1024(b)(4). 2006 WL 5942162, at *3 (W.D. Wis. Dec. 12, 2006). As for the breach of fiduciary duty claim set forth in Count Two, the court dismissed that claim against CIGNA because Mondry was only seeking legal relief, in the court's view, and for causes of action brought under section 1104(a)(1), section 1132(a)(3) only provides for equitable relief. 2006 WL 2787867, at *4. American Family did not seek dismissal of Count Two, but it later sought and obtained summary judgment on this claim. The court

saw no proof that American Family had breached its fiduciary duty by withholding material information from Mondry: rather, American Family had done what it could to help Mondry obtain the documents she sought from CIGNA. As for material misrepresentations, assuming that American Family had incorrectly represented to Mondry that the SPD was the only document that controlled the evaluation of her claim for benefits, there was no evidence that Mondry had relied on this representation to her detriment, because she continued to pursue her document requests. Finally, the record was devoid of proof that American Family had subjugated Mondry's interests to its own by minimizing the efforts of its staff to help Mondry locate copies of the documents that CIGNA had relied on in denying her claim. 2006 WL 3883601, at *12-*13.

## II.

### A.  Count One: Failure to Produce Plan Documents

Pursuant to 29 U.S.C. § 1024(b)(4), the administrator of a plan has an obligation to produce to a plan participant certain documents upon her request:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary[ ] plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to

> cover the cost of furnishing such complete copies. The Secretary [of Labor] may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

The purpose of this disclosure provision is to "ensure[ ] that 'the individual participant knows exactly where he stands with respect to the plan[.]'" *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 118, 109 S. Ct. 948, 958 (1989) (quoting H.R. Rep. 93-533, p.11 (1973), U.S. Code Cong. & Admin. News 1978, p. 4649). Knowing where one stands with respect to a plan includes having the information necessary to determine one's eligibility for benefits under the plan, *see Davis v. Featherstone*, 97 F.3d 734, 737 (4th Cir. 1996), to understand one's rights under the plan, *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1070 (6th Cir. 1994), to identify the persons to whom management of plan funds has been entrusted, *Hughes Salaried Retirees Action Comm. v. Admin. of Hughes Non-Bargaining Retirement Plan*, 72 F.3d 686, 690 (9th Cir. 1995) (en banc) (quoting S. Rep. No. 93-127, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S. Code Cong. & Admin. News 4838, 4863), and to ascertain the procedures one must follow in order to obtain benefits, *id.*

Teeth are given to this obligation by 29 U.S.C. § 1132(c)(1)(B), which renders a non-compliant administrator liable for fines in the event he fails to timely produce requested plan documents.

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a

participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, . . . each violation described in sub-paragraph (B) with respect to any single participant or beneficiary[ ] shall be treated as a separate violation.

By regulation, the maximum permissible penalty under section 1132(c)(1) has been increased to $110 per day. 29 C.F.R. § 2575.502c-3.

Both the duty to produce and liability for the failure or refusal to produce plan documents are placed on the "administrator," and as that term is defined, it includes only American Family, not CIGNA. The term "administrator" is defined in 29 U.S.C. § 1002(16)(A) to mean:

(i)    the person specifically so designated by the terms of the instrument under which the plan is operated;

(ii)   if an administrator is not so designated, the plan sponsor; or

(iii)  in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

It is undisputed in this case that the SPD expressly designated American Family as the Plan administrator, R. 13 Ex. B at 44, thus rendering American Family the one and only "administrator," pursuant to section 1002(16)(A)(i), with the duty to produce plan documents. *Jones v. UOP*, 16 F.3d 141, 144 (7th Cir. 1994).

CIGNA's role as the claims administrator did not bring it within the reach of sections 1024(b)(4) and 1132(c)(1). Consistent with the terms of these statutory provisions, this court and others have held that liability under section 1132(c)(1) is confined to the plan administrator and have rejected the contention that other parties, including claims administrators, can be held liable for the failure to supply participants with the plan documents they seek. *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1149 (7th Cir. 1998); *Jones*, 16 F.3d at 144; *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 843-44 (6th Cir. 2007); *Ross v. Rail Car Am. Group Disability Income Plan*, 285 F.3d 735, 743-44 (8th Cir. 2002); *Lee v. Burkhart*, 991 F.2d 1004, 1010 (2d Cir. 1993); *McKinsey v. Sentry Ins.*, 986 F.2d 401, 403-05 (10th Cir. 1993). *See also Klosterman v. Western Gen. Mgmt., Inc.*, 32 F.3d 1119, 1122 (7th Cir. 1994) (holding that liability for failing to comply with requirements of 29 U.S.C. § 1022(b) as to contents of SPD falls solely on plan administrator) (coll. cases dealing with section 1024(b)).

Mondry nonetheless suggests, incorrectly, that our decisions in *Jones* and *Rud v. Liberty Life Assurance Co. of Boston*, 438 F.3d 772, 774-75 (7th Cir. 2006), leave the door open to treating another party, including the claims

administrator, as a de facto plan administrator for pur-
poses of section 1024(b)(4). In fact, as our decision in
*Jones* points out, only a minority of the circuits have
shown a willingness to recognize de facto plan admin-
istrators. 16 F.3d at 145 (citing *Law v. Ernst & Young*, 956
F.2d 364, 373-74 (1st Cir. 1992); *Fisher v. Metro. Life Ins. Co.*,
895 F.2d 1073, 1077 (5th Cir. 1990); and *Rosen v. TRW, Inc.*,
979 F.2d 191 (11th Cir. 1992)). Most courts have rejected
that theory. *See id.* (coll. cases). Our own decisions on the
subject have never embraced the concept of a de facto
plan administrator, and Mondry presents us with nothing
more than a cursory argument in favor of doing so here.

What we have left the door open to is the possibility that
a non-administrator may be equitably estopped to deny
that it is the plan administrator. In *Jones*, we held that a
retiree (Jones) was not entitled to statutory penalties
from his former employer, UOP, for its delays in respond-
ing to his requests for copies of pension plan documents.
UOP was not the plan administrator but rather the plan
sponsor; the plan instrument specifically designated the
Signal Plan Administrative Committee as the plan adminis-
trator. We rejected the notion that UOP had assumed the
statutory obligation to respond to Jones's document
requests by failing to direct him and his attorneys to
the Administrative Committee: "The statute is plain: if a
plan administrator is designated in the plan instrument,
that is who has the statutory duty to respond to requests
for information in a timely fashion under threat of mone-
tary penalty if he fails to do so." 16 F.3d at 144. We went on
to acknowledge the possibility that, in the right circum-
stances, the doctrine of equitable estoppel might be used

to impose the duty of production on someone other than the plan administrator, including a plan sponsor like UOP:

> We can imagine a case in which the plan sponsor would be estopped to deny that it was the administrator . . . . If UOP's legal department had told Jones's lawyer to forget about the Committee and direct all his document requests to the legal department, and if in reliance on this advice the lawyer had forgone an opportunity to obtain the documents from the plan administrator and Jones had suffered a harm as a result, the elements of equitable estoppel would be present. *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 648 (7th Cir. 1993). We have no reason to doubt the applicability of that venerable doctrine, as a matter of federal common law, to suits for the statutory penalty . . . .

16 F.3d at 144. However, we saw no need to definitively resolve the issue, for Jones had not established the elements of equitable estoppel: Although UOP had responded to Jones's document requests, there was no proof that it had misled Jones about the identity of the plan administrator by instructing him to deal only with UOP. *Id.* at 145. *See also Rud*, 438 F.3d at 774-75 (again recognizing the possibility of using equitable estoppel to treat someone other than the official plan administrator as the plan administrator).

Here, as in *Jones*, the facts do not support CIGNA being deemed a plan administrator via equitable estoppel. There is no proof that CIGNA ever held itself out to Mondry and her counsel as the plan administrator or instructed

Mondry to deal only with CIGNA to the exclusion of American Family, the actual plan administrator. Mondry's equitable estoppel theory is misfocused. She points first to CIGNA's initial decision that Zev's speech therapy was not covered under the terms of the Plan, characterizing that as a misrepresentation about the scope of plan coverage that led her not to elect continued COBRA coverage under the Plan when she left American Family's employ. But that has nothing to do with the identity of the plan administrator and the obligation to produce plan documents. More pertinently, Mondry points to CIGNA's statements, conveyed in at least one instance through American Family, describing the CRT as a proprietary document and denying any obligation to produce either the BIRT or CRT to Mondry. Purportedly as a result of such statements, "Ms. Mondry came to believe and acted on the belief that American Family lacked either the authority or the intent to provide her with the plan documents she requested. . . . Ms. Mondry ceased communication with the designated Plan Administrator, and began directing her communications exclusively to CIGNA." Mondry Br. at 35. But the statements Mondry cites fall short of misrepresenting CIGNA's status. These statements certainly manifest CIGNA's refusal to produce the documents that Mondry wanted, and American Family's apparent acquiescence reflect its own unwillingness to do anything about CIGNA's refusal; but none of this was evidence that CIGNA was in any sense portraying itself as the plan administrator or steering Mondry away from American Family. The SPD left no doubt that American Family was the plan administrator with the

statutory obligation to produce plan documents, and there is nothing in the record before us suggesting that anything CIGNA did or said led Mondry or her counsel astray on that point.

So it is American Family and American Family alone that bore the responsibility to honor Mondry's requests. The next question is whether the documents that Mondry requested are the types of documents that section 1024(b)(4) required American Family to produce. We conclude that they are. We begin with the most straight-forward of the documents that Mondry requested, the 1996 claims administration agreement between American Family and CIGNA.[6]

Section 1024(b)(4) requires the plan administrator to produce (on request) copies of "the latest updated sum-

---

[6] It appears that Mondry first explicitly requested a copy of this agreement after John Pendergast, of CIGNA's National Appeals Unit, advised Mondry's representative that CIGNA's review of her Level Two appeal would be predicated upon, among other documents, the "general service agreement." *See supra* at 14; R. 3 Ex. 17. Thereafter, Mondry began to include that agreement in her ongoing document requests. *E.g.*, R. 3 Ex. 18. No issue is raised as to whether the "general service agreement" that Pendergast reference and the "claims adminis-tration agreement" that the parties refer to on appeal are the same or different documents, nor does either American Family or CIGNA contend that they were confused as to which agree-ment Mondry was seeking. It is not clear to us when Mondry finally obtained a copy of the claims administration agree-ment. A copy of that agreement is in the record. R. 40 Ex. A.

mary[ ] plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." Needless to say, the claims administration agreement is a contract, but the relevant question is whether it is a contract "under which the plan is established or operated," such that it falls within the scope of section 1024(b)(4).

The claims administration agreement qualifies as such an agreement. That contract both established CIGNA as the claims administrator and identified the respective authority and obligations of American Family and CIGNA with respect to the plan: American Family bore responsibility for determining the eligibility of its employees to participate in the plan, enrolling eligible individuals in the plan, and communicating that information to CIGNA; whereas CIGNA bore responsibility for receiving benefit claims, determining whether claimants were eligible for benefits and the amount of money they were owed, disbursing payments, and providing appellate review of any adverse claims determinations. R. 40 Ex. A. The district court believed that the agreement did not qualify for production under section 1024(b)(4) because it did not "define what rights or benefits [were] available to the Plan's participants and beneficiaries." R. 45 at 19. That is true enough. *See Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 817 (7th Cir. 2002) (administrative services agreement between employer and plan administrator is not a plan document in sense that its terms may be held against plan participants and beneficiaries). But the agreement nonetheless governs the operation of the Plan

in the sense that it defines the respective roles of American Family and CIGNA as the plan and claims administrators, respectively. *See Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 143 (2d Cir. 1997) ("[a]greements and contracts plainly set out rights and duties"). Where the administration of a plan is divided, as is often the case, *see*, *e.g.*, *Rud*, 438 F.3d at 774, the extent of each administrator's authority is basic information that a plan participant needs to know. In that respect, we believe it qualifies as a contract under which the plan was operated, and Mondry was entitled to its production under section 1024(b)(4). *See Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1343 (11th Cir. 2006); *Michael v. Am. Int'l Group, Inc.*, 2008 WL 4279582, at *6 (E.D. Mo. Sep. 15, 2008).[7]

The other documents that Mondry requested, the BIRT and CRT, present a closer question. The obligation, if any, to produce these documents arises from section 1024(b)(4)'s catch-all reference to "other instruments under which the plan is established or operated." In *Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 758-59 (7th Cir. 1999), we

---

[7] American Family points out that "a contract of insurance sold *to* a plan is not itself 'the plan.' " *Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723, 724 (7th Cir. 2003) (emphasis in original) (citing *Pegram v. Herdrich*, 530 U.S. 211, 120 S. Ct. 2143 (2000)). But that is not the type of contract that is at issue here. Connecticut General did not agree to provide insurance to American Family, but rather agreed to administer claims against the Plan on American Family's behalf.

rejected a broad construction of the catch-all language that would sweep within its reach all documents relevant to a plan and instead agreed with those courts which have construed the catch-all language narrowly to reach only those documents that formally govern the establishment or operation of a plan:

> Other courts of appeals have found that the use of the term "instruments" implies that the statute reaches only formal legal documents governing a plan. See *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 652-54 (4th Cir. 1996); *Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 142-45 (2d Cir. 1997). Plaintiffs argue that this interpretation of the requirement is too narrow, and that they should have a right to all documents that provide information about a plan and its benefits. We agree with our sister circuits that the latter interpretation would make hash of the statutory language, which on its face refers to a specific set of documents: those under which a plan is established or operated. If it had meant to require production of all documents relevant to a plan, Congress could have said so. This is not to say, of course, that companies have a permanent privilege against disclosing other documents. It means only that the affirmative obligation to disclose materials under ERISA, punishable by penalties, extends only to a defined set of documents. If litigation comes along, then ordinary discovery rules under the management of the district court provide the limits on what must be produced. It is possible, of course, that this narrow reading of § 1024(b)(4) may create an

incentive at the margins for plaintiffs to litigate rather than to rest satisfied with the internal remedies offered by a plan, so that they can find out what else is influencing the administrator's interpretation of a plan. Companies with a more generous view of their own obligations and self-interest may seek to counteract that incentive by disclosing more rather than less in response to employee requests.

*See also Shaver v. Operating Eng'rs Local 428 Pension Trust Fund*, 332 F.3d 1198, 1202 (9th Cir. 2003); *Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 861 (8th Cir. 1999); *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 60 (1st Cir. 1999); *Allinder v. Inter-City Prods. Corp. (USA)*, 152 F.3d 544, 549-50 (6th Cir. 1998). Consistent with this limited construction of section 1024(b)(4), a number of courts have concluded that internal guidelines or memoranda that a claims administrator uses in deciding whether or not a claim for benefits falls within the coverage of a plan do not constitute "other instruments under which the plan is established or operated." *See Doe*, 167 F.3d at 60; *Giertz-Richardson v. Hartford Life & Accident Ins. Co.*, 2007 WL 1099094, at *2 (M.D. Fla. Apr. 10, 2007); *Morley v. Avaya Inc. Long Term Disability Plan for Salaried Employees*, 2006 WL 2226336, at *19 (D. N.J. Aug. 3, 2006); *Brucks v. Coca-Cola Co.*, 391 F. Supp. 2d 1193, 1209-12 (N.D. Ga. 2005); *Cohen v. Metro. Life Ins. Co.*, 2003 WL 1563349, at *2-*3 (S.D.N.Y. Mar. 26, 2003); *Tutolo v. Independence Blue Cross*, 1999 WL 274975, at *2 (E.D. Pa. May 5, 1999); *contra Hernandez ex rel. Hernandez v. Prudential Ins. Co. of Am.*, 2001 WL 1152835, at *4-*6 (D. Utah Mar. 28, 2001); *Teen Help, Inc. v. Operating Eng'rs Health & Welfare Trust Fund*, 1999 WL 1069756, at *2-*3

(N.D. Cal. Aug. 24, 1999); *Lee v. Dayton Power & Light Co.*, 604 F. Supp. 987, 1002 (S.D. Ohio 1985); *see also* Dep't of Labor Adv. Op. Letter 96-14a (July 31, 1996) ("it is the view of the Department of Labor that for purposes of section 104(b)(2) and 104(b)(4), any document or instrument that specifies procedures, formulas, methodologies, or schedules to be applied in determining or calculating a participant's or beneficiary's benefit entitlement under an employee benefit plan would constitute an instrument under which the plan is established or operated, regardless of whether such information is contained in a document designated as the 'plan document' "). The courts holding that internal guidelines and memoranda do not constitute plan documents within the scope of section 1024(b)(4) have reasoned that however relevant such guidelines and memoranda may be to a plan beneficiary's entitlement to benefits, as internal interpretative tools they are not binding on the claims administrator and therefore do not formally govern the operation of the plan. *E.g.*, *Doe*, 167 F.3d at 60. It is, instead, the language of the plan itself that remains dispositive of a beneficiary's rights, and of course section 1024(b)(4) expressly identifies both a plan and a summary plan description as documents to which the beneficiary is entitled.

There is also a separate statutory provision that may, in conjunction with regulations that the Secretary of Labor has promulgated, entitle a plan beneficiary to copies of the internal guidelines and other documents on which a claims administrator has relied in denying her claim for benefits. 29 U.S.C. § 1133 provides that "[i]n accordance with regulations of the Secretary, every employee benefit

plan shall— . . . (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." The Secretary's regulations in turn state that a plan will not be deemed to have afforded a claimant "full and fair review" unless, among other things, the claimant was provided "reasonable access to, and copies of, all documents, records, and other information *relevant to the claimant's claim for benefits*." 29 C.F.R. § 2560.503-1(h)(2)(iii) (emphasis ours). A document is deemed "relevant" if it "[w]as relied upon in making the benefit determination" or, in the case of a group health plan, the document "constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination." § 2560.503-1(m)(8)(i) and (iv). Many items that do not qualify as documents that govern the establishment or operation of a plan for purposes of section 1024(b)(4) may qualify as documents that are relevant to a plan participant's claim for benefits for purposes of section 1133(2) and the Secretary's regulations. *Doe*, 167 F.3d at 60-61. Thus, a participant who is denied access to internal guidelines that relate to her unsuccessful claim for benefits may be able to show that she was denied full and fair review of the denial by the claims administrator. *Id.*; *Brucks*, 391 F. Supp. 2d at 1212 n.18. *Cf. Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 402-03, 406-07 (7th Cir. 1996) (although plaintiff's contention that she was denied a copy of her disability

claim file failed to state a claim for statutory penalties under section 1132(c), her allegation that without the claim file she could not identify "pertinent documents" and formulate a meaningful appeal was sufficient to state viable claim that insurance company denied her meaningful access to final administrative review).

Mondry did not seek relief under section 1133(2), but it is no mystery why she did not. Mondry ultimately obtained copies of the BIRT and CRT, and it was in large part the production of those documents that enabled her to show that CIGNA had improperly denied her claim for the speech therapy Zev had received. Mondry, in fact, prevailed at her Level Two appeal, convincing CIGNA to reverse its position and grant her claim. Having succeeded in her appeal, Mondry was in no position to argue that CIGNA denied her the full and fair review to which she was entitled under section 1133(2). The harm that she suffered was not the denial of full and fair review, but rather the lengthy delay in the production of documents that were key to her success in that review. That is why she contends that she was entitled to the timely production of the BIRT and CRT pursuant to section 1024(b)(4) and is now entitled to penalties pursuant to section 1132(c)(1)(B) for the defendants' failure to produce these documents within thirty days of her written demand for these documents.

We may assume, without deciding, that had CIGNA privately relied on the CRT and BIRT as reference materials to guide its interpretation and application of the plan language, these documents would not have come

within the scope of section 1024(b)(4). In that circumstance, it would not be possible to characterize the CRT and BIRT as documents that formally established or governed the operation of the plan. *See Ames*, 170 F.3d at 758-59. The language of the plan itself would have remained dispositive of one's entitlement to benefits, and that language would be all that a plan participant would require in order to know her rights and to effectively appeal any adverse benefits determination. Had Mondry been denied copies of the BIRT and CRT and had she lost her Level Two appeal, she might have had an argument that her inability to see the interpretative tools that CIGNA had relied on in applying the plan language denied her the right to full and fair review accorded to her by section 1133(2). *See* 29 C.F.R. § 2560.503-1(h)(2)(iii); *cf. Wilczynski*, 93 F.3d at 402-03. She might also be entitled to the production of the BIRT and CRT in discovery in a lawsuit, as we suggested in *Ames.* 170 F.3d at 759.

But CIGNA did not treat the BIRT and CRT as private guidelines that merely illuminated plan language—anything but. CIGNA expressly cited both documents as the basis for its decision to deny Mondry's claim for benefits and invited Mondry's reference to them. In its first letter to Mondry (dated June 13, 2003) denying her claim, CIGNA spelled out its reasons for concluding that Zev's speech therapy was not medically necessary—noting that his therapy was "not restorative" but rather "educational or training"—and concluded the rationale with the following notation: "Based on CIGNA's Benefit Resources Tools Guidelines—Speech Therapy." R. 3 Ex. 1. The following month, in CIGNA's July 23, 2003

letter denying Mondry's first-level appeal, Dr. Loudis reiterated CIGNA's conclusion that "[s]peech therapy, which is not restorative, is not a covered expense per the patient's specific plan provisions." R. 3 Ex. 4. Rather than directing Mondry to the provisions of the SPD, Loudis's letter advised Mondry to "[r]eference CIGNA[ʼs] Clinical Resource tool for Speech Therapy." *Id.* Thus, in its correspondence with Mondry denying her claim for benefits and then affirming that denial, CIGNA treated the BIRT and CRT as authoritative sources, citing them expressly as the bases for its decisions and overtly inviting Mondry to consult them. Moreover, as the letters themselves suggested and a review of the BIRT later confirmed, CIGNA was citing language from the BIRT that was nowhere to be found in the SPD's definition of what is "medically necessary" and which, in fact, constituted a substantive departure from the Plan language. In particular, nothing in the SPD suggests that therapy must be "restorative" in order to qualify as "medically necessary." In short, CIGNA had been relying on the BIRT and CRT as the equivalent of plan language, treating the former documents as if they were dispositive and citing them to Mondry as such. Having expressly relied on the BIRT and CRT as the bases for its decision to deny Mondry's claim for benefits, CIGNA gave those guidelines the status of documents that govern the operation of a plan, and their production to Mondry thus became mandatory under section 1024(b)(4).

The fact that neither document was actually binding on CIGNA—indeed, that CIGNA had relied upon them improperly—is beside the point. What is relevant is

that CIGNA expressly relied on them, and language from one of them, as dispositive in denying her claim. That is what entitled Mondry to the production of these documents as plan documents. It would be no different if CIGNA had instead cited an old version of the plan in denying Mondry's claim. Normally, a plan participant would not be entitled to outdated plan documents under section 1024(b)(4). *See Shields v. Local 705, Int'l Bhd. of Teamsters Pension Plan*, 188 F.3d 895, 903 (7th Cir. 1999). But were a claims administrator to expressly rely on a superseded version of the plan, it would be treating that version (albeit in error) as the document that governs the operation of the plan; and for that reason the participant would be entitled to its production. As we noted at the outset of our discussion, the purpose of section 1024(b)(4)'s disclosure provision is to enable a plan participant to understand his rights under the plan, including his eligibility for benefits. *Supra* at 23. When a claims administrator mistakenly relies on an expired version of the plan document, a set of internal guidelines, or any other extraneous document in lieu of the governing plan language and, indeed, cites the language of that document as controlling to the participant, then the participant must have access to that document in order to understand what the claims administrator is doing and to effectively assert his rights under the plan. It does not strike us as a coincidence that CIGNA's decision to reverse itself and grant Mondry's claim for benefits came *after* CIGNA finally produced the BIRT and CRT to her counsel. One may plausibly infer from the record that it was the production of those documents that enabled Mondry and her

counsel to expose CIGNA's error and convince CIGNA that she was entitled to benefits under the governing plan language.

For the same reason, the fact that Mondry's representative agreed, in her December 21, 2004 letter to CIGNA, that the BIRT was not contractually binding on CIGNA, is a red herring. Recall that this is what the district court ultimately relied on to reject Mondry's claim. 2006 WL 5942162, at *3. We may set aside without comment any question as to whether Mondry may be bound in this suit by a letter written prior to the litigation by a law clerk. Having by that time seen the BIRT and CRT, Mondry's representative was merely correctly arguing that the BIRT contained language that was not found in the Plan—i.e., the SPD—itself and that, in fact, was inconsistent with the SPD, and yet CIGNA appeared to have relied on the BIRT rather than the governing Plan language in denying her claim. R. 3 Ex. 23 at 6-7. Indeed, in the same sentence that she agreed with the proposition that the BIRT was not binding, Mondry's representative also remarked that "it seems obvious that [the BIRT] was used to deny our client's claim . . . ." *Id.* at 6. This was wholly consistent with the legal theory that Mondry has espoused in this suit: that although neither the CRT nor the BIRT was a binding plan document, because CIGNA treated them as such, Mondry was entitled to their production under section 1024(b)(4).

Our holding is a narrow one. We are not saying that simply because a claims administrator relies on a set of internal guidelines, rightly or wrongly, in denying a

claim for benefits, those documents become subject to mandatory production under section 1024(b)(4); that is an issue we need not and do not reach. But when a claims administrator expressly cites an internal document and treats that document as the equivalent of plan language in ruling on a participant's entitlement to benefits, the administrator renders that document one that in effect governs the operation of the plan for purposes of section 1024(b)(4), and production of that document is required. To hold otherwise would, in our view, allow a claims administrator to "hide the ball" from the participant, depriving her of access to the very documents that the claims administrator is saying are dispositive of her claim.

A final wrinkle here is that CIGNA rather than American Family had possession of the BIRT and CRT, and yet CIGNA was not the plan administrator with the statutory obligation to produce plan documents. American Family argues that this is a reason to relieve it of liability, particularly in view of the fact that at Mondry's urging, one of its attorneys contacted CIGNA in April 2004 in an effort to obtain a copy of the CRT but was told by CIGNA that the CRT was a proprietary document that CIGNA was unwilling to produce. At that point, American Family argues, it had done all that it could do for Mondry and bore no culpability for CIGNA's continued delays in producing the CRT and other documents to her. Section 1132(c)(1)(B) itself indicates that a plan administrator will not be liable for penalties where its failure or refusal to produce plan documents "results from matters reasonably beyond the control of the administrator."

In the normal course of events, the plan administrator will possess all of the documents whose production is required by section 1024(b)(4) even where responsibility for administration of the plan is divided, as it was here. As we discussed earlier, the universe of documents that qualify as ones "under which the plan is established or operated" for purposes of this statutory provision is small and is limited to those documents that formally, i.e., legally, govern the establishment or operation of the plan. The plan administrator will necessarily have those documents even when responsibility for handling claims for benefits has been assigned to a different party.

A problem will arise, as it has here, when the claims administrator mistakenly treats its own internal guidelines and checklists as binding, placing them on par with (or even displacing) the plan itself. When the claims administrator cites such internal documents as controlling, those documents will become subject to production pursuant to section 1024(b)(4), for the reasons we have discussed. And the duty to produce these documents will still belong to the plan administrator, just as it does with respect to other plan documents. That may pose a bit of a challenge for the plan administrator when the documents in question are within the exclusive possession of the claims administrator.

Any dilemma this may have posed for American Family did not excuse its statutory obligation to Mondry, however. It was American Family, of course, that decided to engage someone else as claims administrator, that chose CIGNA, and that gave CIGNA the authority to handle

claims on its behalf. Section 2 of the contract between the two parties expressly identified CIGNA as American Family's agent for purposes of claims administration. R.40 Ex. A at 1. Moreover, once American Family was placed on notice that CIGNA was expressly relying on language not found in the plan itself to deny Mondry's claim and that Mondry was demanding copies of the documents containing that language, American Family had an obligation to obtain those documents from CIGNA and to produce them to Mondry in compliance with its duty as the plan administrator. True, on the one occasion that American Family's attorney discussed Mondry's request for a copy of the CRT with CIGNA's Carl Peterson, Peterson claimed that the CRT was proprietary and, in any event, too voluminous to produce. Obviously, however, CIGNA did not stick to its position: CIGNA ultimately produced both the CRT, which turned out not to be voluminous at all, and later the BIRT to Mondry voluntarily. The production likely would have occurred much sooner had American Family itself insisted that CIGNA turn over the documents. But even if CIGNA had not changed its mind, we are not persuaded that its refusal to produce these documents would have relieved American Family of its statutory duty to Mondry.

If the contract between American Family and CIGNA did not give American Family the right to insist on the production of internal documents such as the BIRT and CRT, this was certainly a right that American Family could have bargained for. A review of the 1996 service agreement between American Family and CIGNA

suggests that American Family indeed may have had the contractual right to insist on being given copies of documents such as the CRT and BIRT, whether pursuant to section 6(a) of the agreement, which assigned to American Family the ownership of "[a]ll documents relating to the payment of claims," or section 6(d), which obliged CIGNA to make available by audit its "files, books, procedures and records pertaining to the Plan or the services provided by [CIGNA] under this Agreement." R. 40 Ex. A at 4-5. We say that American Family *may* have had such a right because the parties have not briefed the issue, and it is not, in our view, one that we need to resolve—although for what it is worth, we note that CIGNA's counsel at oral argument represented that American Family did have the right under the agreement to demand these documents from CIGNA. What matters, in our view, is that American Family contracted with CIGNA to handle claims administration as its agent, and if American Family did not include in the contract a provision entitling it to copies of any documents that might be covered by section 1024(b)(4), it certainly could have done so. Access to such documents thus was not a matter "reasonably beyond the control" of American Family as the plan administrator. *See* § 1132(c)(1)(B).

Mondry was entitled to copies of the service agreement between American Family and CIGNA, the BIRT, and the CRT, and American Family as the plan administrator is liable for its failure to produce these documents to Mondry within thirty days of her written requests for them. We have no doubt that had these

documents (in particular, the BIRT and CRT) been produced to her in a timely fashion, CIGNA's apparent negligence in denying Mondry's claim for reimbursement for her son's speech therapy would have been rectified much sooner than it was. Mondry is entitled to statutory penalties for the late production. Although we affirm dismissal of Count One of Mondry's complaint as against CIGNA, because CIGNA was not the plan administrator, we shall reverse the district court's entry of summary judgment in favor of American Family and remand with directions to enter summary judgment in favor of Mondry and against American Family on Count One. The determination of the appropriate amount is a matter within the district court's discretion. § 1132(c)(1); *see Ames*, 170 F.3d at 759-60. We shall remand the case to the district court for a determination as to the appropriate amount of the penalty.

## B. Count Two: Breach of Fiduciary Duty

In Count Two of her complaint, Mondry alleges that both CIGNA and American Family violated the duties they owed to her as fiduciaries under 29 U.S.C. § 1104(a)(1). *See Kannapien v. Quaker Oats Co.*, 507 F.3d 629, 639 (7th Cir. 2007) (outlining elements of claim for breach of fiduciary duty), *cert. denied*, 129 S. Ct. 62 (2008). Neither defendant disputes that it qualifies as a fiduciary under ERISA. *See* 29 U.S.C. § 1002(21)(A)(i) & (iii) (defining fiduciary to include any person with discretionary authority in management of plan or its assets or discretionary responsibility in administration of plan); *see also*, *e.g.*,

*Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 438 (6th Cir. 2006) (claims administrator is fiduciary when it has authority to grant or deny benefit claims); *Jenkins v. Yager*, 444 F.3d 916, 924 (7th Cir. 2006) (deeming plan administrator a fiduciary). Mondry asserts that CIGNA breached its fiduciary obligations by misrepresenting the terms of the plan and failing to timely disclose material information necessary for her to pursue her Level Two appeal for benefits. Pursuant to 29 U.S.C. § 1132(a)(3), she seeks to hold CIGNA liable for $303.89 in medical expenses for which she alleges CIGNA has yet to reimburse her, additional medical expenses that she incurred because she declined COBRA coverage based on CIGNA's alleged misrepresentations, and the lost time value of funds that she spent on Zev's speech therapy before she was finally reimbursed following her successful Level Two appeal. As to American Family, Mondry alleges that her former employer failed to produce the information that she needed to prosecute her appeal of the original decision to deny her claim for benefits (again, the BIRT and CRT), misrepresented to her that the one and only Plan document was the SPD, and subjugated her interests to its own by taking a hands-off role in clarifying which documents governed her claim for benefits and in helping her to obtain those documents from CIGNA. Mondry contends that, like CIGNA, American Family is liable for the lost time value of the funds she used to pay for Zev's speech therapy until she prevailed in her Level Two appeal as well as the expenses Mondry incurred as a result of her decision to decline COBRA coverage. As we have noted, the district court dismissed

the breach of fiduciary duty claim as to CIGNA on the ground that the complaint did not seek equitable relief. The court later granted summary judgment in favor of American Family on this claim because Mondry had not established that American Family made a misleading representation to her, that she had relied on such a misrepresentation to her detriment, or that American Family had subjugated Mondry's interests to its own.

The statutory provision pursuant to which Mondry seeks relief authorizes only a limited range of remedies, raising a threshold question as to whether the relief she demands is authorized. Section 1132(a)(3) provides:

> A civil action may be brought . . . by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, (B) to obtain other appropriate equitable relief (i) to redress such violations, or (ii) to enforce any provisions of this subchapter or the terms of this plan.

The Supreme Court's decision in *Varity Corp. v. Howe*, 516 U.S. 489, 507-15, 116 S. Ct. 1065, 1075-79 (1996), confirms that section 1132(a)(3) is an appropriate vehicle for remedying a breach of the fiduciary obligations owed to plan participants. But Mondry is seeking monetary rather than injunctive relief, and the former can be justified only if it falls within the scope of the "other appropriate equitable relief" authorized by the statute. The Court in *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 113 S. Ct. 2063 (1993), rejected an expansive construction of "equitable relief" that might have included legal remedies, and instead

construed the term to include only "those categories of relief that were *typically* available in equity . . . ." *Id.* at 256, 113 S. Ct. at 2069 (emphasis in original). The Court's subsequent decision in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210, 122 S. Ct. 708, 712-13 (2002), reaffirmed that the "equitable relief" authorized by section 1132(a)(3) will normally not include monetary relief, even when the plaintiff asserts that an ERISA plan entitles him to the money he seeks:

> Here, petitioners seek, in essence, to impose personal liability on respondents for a contractual obligation to pay money—relief that was not typically available in equity. "A claim for money due and owing under a contract is 'quintessentially an action at law.'" *Wal-Mart Stores, Inc. v. Wells*, 213 F.3d 398, 401 (C.A. 7 2000) (Posner, J.). "Almost invariably . . . suits seeking (whether by judgment, injunction or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Bowen v. Massachusetts*, 487 U.S. 879, 918-919, 108 S. Ct. 2722, 101 L.Ed.2d 749 (1988) (SCALIA, J., dissenting). And "[m]oney damages are, of course, the classic form of *legal* relief." *Mertens*, *supra*, at 255, 113 S. Ct. 2063.

(Emphasis in original.) *Cf. Sereboff v. Mid Atlantic Med. Servs.*, 547 U.S. 356, 126 S. Ct. 1869 (2006) (suit by insurer seeking reimbursement pursuant to plan provision from identifiable funds within defendants' possession

was a suit for "appropriate equitable relief" within scope of section 1132(a)(3)).

As *Knudson* makes clear, Mondry's claim for the $303.89 that she claims CIGNA has yet to pay her as reimbursement for Zev's speech therapy is a form of legal relief that section 1132(a)(3) does not authorize. It is a demand for money to which Mondry believes the terms of the Plan entitle her. As such it is relief that Mondry could have sought under section 1132(a)(1)(B), which expressly authorizes a suit by a plan participant "to recover benefits due to him under the terms of the plan[.]" *See*, *e.g.*, *Magin v. Monsanto Co.*, 420 F.3d 679, 687-88 (7th Cir. 2005) (suit for benefits due under plan is not suit for equitable relief). But Mondry has never invoked that provision as support for her claim. *Varity* observes that section 1132(a)(3) authorizes only "appropriate" equitable relief, 516 U.S. at 515, 116 S. Ct. at 1079, and adds that where relief is available to a plan participant under other provisions of the statute, relief may not be warranted under section 1132(a)(3):

> We should expect that courts, in fashioning "appropriate" equitable relief, will keep in mind the "special nature and purpose of employee benefit plans," and will respect the "policy choices reflected in the inclusion of certain remedies and the exclusion of others." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. [41], at 54, 107 S. Ct. [1549], at 1556 [(1987)]. See also [*Massachusetts Mut. Life Ins. Co. v.*] *Russell*, 473 U.S. [134], at 147, 105 S. Ct. [3085], at 3092-3093 [(1985)]; *Mertens*, 508 U.S., at 263-264, 113 S. Ct., at 2072. Thus, we should expect

that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate." Cf. *Russell*, *supra*, at 144, 105 S. Ct., at 3091.

516 U.S. at 515, 116 S. Ct. at 1079. Consistent with *Varity*'s admonition, a majority of the circuits are of the view that if relief is available to a plan participant under subsection (a)(1)(B), then that relief is *un*available under subsection (a)(3). *See Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101, 106 (4th Cir. 2006) (coll. cases). Although we have not had occasion to consider that question, Mondry has given us no reason to depart from the holdings of those circuits.

Nor has Mondry shown that she is entitled to compensation for the additional medical expenses she was forced to pay as a result of her decision not to continue participating in the Plan under COBRA when she terminated her employment with American Family. Mondry's contention is that when CIGNA initially denied her claim for Zev's speech therapy, it represented to her, falsely, that the therapy was outside the scope of her coverage; thus, when the time came for her to decide whether to elect COBRA coverage, she concluded in reliance on that misrepresentation that there was no point in remaining with the Plan. She maintains that American Family itself played a supporting role in the misrepresentation by not taking meaningful steps to help her obtain from CIGNA the documents that she needed to expose the error in CIGNA's denial of her claim. But what Mondry relied upon in electing to forgo continued participation

in the Plan under COBRA was CIGNA's initial, erroneous decision to deny her claim. Yet, Mondry herself realized that CIGNA's decision was not final: She had appeal rights, she exercised those rights, and she ultimately prevailed. It takes more than a mistaken decision by the claims administrator to establish a breach of fiduciary duty. *Schoonmaker v. Employee Sav. Plan of Amoco Corp. & Participating Cos.*, 987 F.2d 410, 414-15 (7th Cir. 1993) (citing *Lister v. Stark*, 11 Employee Benefits Cas. (BNA) 1611, 1617 (N.D. Ill. Aug. 1, 1989), *rev'd in part on other grounds*, 942 F.2d 1183 (7th Cir. 1991)). Nothing that CIGNA or American Family allegedly did or said coerced or deceived Mondry into waiving her COBRA rights and opting out of the AmeriPreferred Plan during the period of time when she was appealing CIGNA's adverse benefit determination.

However, we do think that Mondry has a viable claim against American Family for the lost time value of the money she was forced to expend on Zev's speech therapy until at last she obtained copies of the BIRT and CRT and was able to prevail in her Level Two appeal. Mondry could not have sought this form of relief under section 1132(a)(1)(B), for absent a provision in the plan that grants her the right to interest on past-due benefits (and the AmeriPreferred Plan contains no such provision), restitution of this sort is considered an extra-contractual remedy that is beyond the scope of that section. *See May Dep't Stores Co. v. Fed. Ins. Co.*, 305 F.3d 597, 603 (7th Cir. 2002); *Harsh v. Eisenberg*, 956 F.2d 651, 654-56 (7th Cir. 1992); *see also Harzewski v. Guidant Corp.*, 489 F.3d 799, 804 (7th Cir. 2007). Of course, Mondry has already estab-

lished American Family's liability for statutory penalties under section 1132(c)(1) for its failure to produce Plan documents to her under section 1024(b)(4), but the purpose of those penalties is to induce the plan administrator to comply with the statutory mandate rather than to compensate the plan participant for any injury she suffered as a result of non-compliance. *See Winchester v. Pension Comm. of Michael Reese Health Plan, Inc. Pension Plan*, 942 F.2d 1190, 1193 (7th Cir. 1991); *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 659 (4th Cir. 1996) (coll. cases); *see also Bartling v. Fruehauf Corp.*, *supra*, 29 F.3d at 1068. This is not to say that the harm Mondry suffered due to the lengthy delay in obtaining the documents she sought is irrelevant to the assessment of statutory penalties; on the contrary, it is a material consideration, although not a prerequisite. *See Harsch*, 956 F.2d at 662; *see also Romero v. SmithKline Beecham*, 309 F.3d 113, 120 (3d Cir. 2002) (Alito, J.) ("Other circuits have studied the role of prejudice or damages in the inquiry and have concluded that although they are often factors, neither is a *sine qua non* to a valid claim under section 502(c)(1).") (coll. cases); *Moothart v. Bell*, 21 F.3d 1499, 1506 (10th Cir. 1994) (same). But it is to say that the penalties imposed will not necessarily compensate her for her loss. Consequently, the door remains open to Mondry's request for relief under section 1132(a)(3), so long as what she seeks may be considered equitable relief.

Restitution amounts to a legal remedy in some circumstances and an equitable remedy in others. *See S.E.C. v. Lipson*, 278 F.3d 656, 663 (7th Cir. 2002). "[I]t is a legal remedy when sought in a case at law (for example, a suit

for breach of contract) and an equitable remedy when sought in an equity case. . . . [H]owever, restitution is equitable when it is sought by a person complaining of a breach of trust . . . ." *Clair v. Harris Trust & Sav. Bank*, 190 F.3d 495, 498 (7th Cir. 1999) (citing *Health Cost Controls of Ill., Inc. v. Washington*, 187 F.3d 703, 710 (7th Cir. 1999)); *see also Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 592 (7th Cir. 2000); *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1006-09 (8th Cir. 2004). Mondry, like the plaintiffs in *Clair*, is complaining of a breach of trust. American Family was a fiduciary, and Mondry charges that it breached its fiduciary obligation to her by failing to help her timely obtain the documents to which she was entitled under ERISA and that she needed to establish her right to Plan benefits. *See generally Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C. Cir. 1990) ("The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA."). Because the AmeriPreferred Plan was self-funded, American Family arguably benefitted from the delay that Mondry experienced in obtaining those documents and reversing CIGNA's erroneous denial of her claim for benefits: It had the interest-free use of money that should have been paid to Mondry much sooner than it was. Restitution would thus force American Family to disgorge the gain it enjoyed from the delay that its breach of trust helped to bring about. *See May Dep't Stores*, 305 F.3d at 603; *Lipson*, 278 F.3d at 663; *Clair*, 190 F.3d at 498.

This assumes that American Family in some way breached its fiduciary obligations to Mondry. ERISA requires a fiduciary to

> discharge his duties with respect to a plan solely in the interest of participants and beneficiaries and—
>
>> (A) for the exclusive purpose of:
>>
>>> (i)　providing benefits to participants and their beneficiaries; and
>>>
>>> (ii)　defraying reasonable expenses of administering the plan;
>>
>> (B) with the care, skill, prudence, and diligence then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

29 U.S.C. § 1104(a)(1). Subsection (A) of this provision imposes a duty of loyalty upon plan administrators, *Frahm v. Equitable Life Assurance Soc. of U.S.*, 137 F.3d 955, 960 (7th Cir. 1998), akin to that of a trustee under common law, *Jenkins v. Yager*, *supra*, 444 F.3d at 924 (quoting *Ameritech Benefit Plan Comm. v. Commc'n Workers of Am.*, 220 F.3d 814, 825 (7th Cir. 2000)); *see also Varity*, 516 U.S. at 506, 116 S. Ct. at 1074-75, and subsection (B) creates a duty of care in executing that duty, *Frahm*, 137 F.3d at 960.[8]

---

[8]　A fiduciary who breaches his obligations to a plan participant or beneficiary is "subject to such . . . equitable or remedial

(continued...)

At common law, a trustee is obliged to provide beneficiaries, at their request, "'complete and accurate information as to the nature and amount of the trust property,' and also 'such information as is reasonably necessary to enable [them] to enforce [their] rights under the trust or to prevent or redress a breach of trust.'" *Faircloth v. Lundy Packing Co.*, *supra*, 91 F.3d at 656 (quoting Restatement (Second) of Trusts § 173 & cmt. c. (1959)); *see also Eddy*, 919 F.2d at 750. In the ERISA context, our cases have recognized the fiduciary's duty not to "'mislead plan participants or misrepresent the terms or administration of a plan,'" *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 640 (7th Cir. 2004) (quoting *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993)), although we have also cautioned that not all mistakes or omissions in conveying information about a plan amount to a breach of fiduciary duty, *Frahm*, 137 F.3d at 960. *See also Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1047 (7th Cir. 2004); *Vallone*, 375 F.3d at 640-41; *cf. Varity*, 516 U.S. at 506, 116 S. Ct. at 1074-75 (reserving question as to whether ERISA fiduciaries have duty to provide truthful information to plan participants, whether on own initiative or in response to participants' inquiries, but agreeing that fiduciaries may not deliberately deceive plan participants and beneficiaries).

Our colleagues in the Fourth Circuit have also looked to the specific disclosure requirements that Congress set

---

[8] (...continued)
relief as the court may deem appropriate . . . ." 29 U.S.C. § 1109(a).

forth in 29 U.S.C. §§ 1022(a) and 1024(b) to inform the scope of the fiduciary's duty to communicate accurate information about the plan to plan beneficiaries. *See Rodriguez v. MEBA Pension Trust*, 872 F.2d 69, 73-74 (4th Cir. 1989) (Wilkinson, J.). Although that court has declined to impose on a plan fiduciary a duty to disclose more information than ERISA's notice provisions require, *Faircloth*, 91 F.3d at 656-58, it has concluded that when a fiduciary fails to make the types of disclosures expressly required by the statute, it has breached its fiduciary obligation to the plan beneficiary, *Rodriguez*, 872 F.2d at 73-74; *see also Eddy*, 919 F.2d at 750 (noting that the fundamental common-law duty of trustee to communicate material information to beneficiary informs many of ERISA's disclosure provisions, including those found in §§ 1022(a) and 1024(b)(4)). We discern no reason to part ways with our sister circuit on this point.

Against this legal backdrop, Mondry has presented evidence from which a factfinder could determine that American Family breached its fiduciary duty to her. Under the express terms of section 1024(b)(4), Mondry was entitled to copies of plan documents, and as we have held, those documents included the BIRT and CRT that the Plan's claims administrator had cited to Mondry as dispositive of her claim for benefits. Mondry could not effectively challenge CIGNA's decision to deny her claim based on these documents without knowing their contents. American Family had notice of the documents Mondry was seeking, her reasons for seeking these documents, and the apparent centrality of those documents to CIGNA's decisionmaking based on the correspondence

that was directed to American Family, the telephonic contacts between American Family and Mondry's representatives, and the correspondence directed to CIGNA on which American Family was copied. In one instance, an in-house attorney for American Family contacted CIGNA on Mondry's behalf to request a copy of the CRT; but American Family dropped its efforts after CIGNA's representative claimed that the CRT was proprietary and "too big to send anyway." Yet a factfinder might conclude that American Family's heart was not in the effort, for its attorney not only accepted CIGNA's refusal without question, but did not even bother picking up the telephone to advise Mondry's counsel of CIGNA's refusal. Only weeks later, when Mondry's representative followed up with her, did American Family's counsel report the outcome of her inquiry. We know, of course, that CIGNA ultimately was willing to and did produce both the BIRT and CRT to Mondry. The factfinder might conclude that by not taking additional steps on Mondry's behalf to obtain these documents from CIGNA, its agent, American Family contributed to the delay and failed to discharge its fiduciary duty as the plan administrator to provide her with the plan documents to which she was entitled by section 1024(b)(4) and which she needed in order to enforce her rights under the AmeriPreferred Plan.

As against CIGNA, however, we conclude that Mondry does not have a viable claim for restitution based on the delay in providing Plan documents to her. Although CIGNA like American Family was a fiduciary, it did not share American Family's obligation under section 1024(b)(4) to produce Plan documents to Mondry. Mondry

has not made a case for imputing to CIGNA a fiduciary duty of disclosure that ERISA itself imposes only on American Family. Moreover, whatever culpability CIGNA might bear for delaying Mondry's appeal by failing to produce the BIRT and CRT to her sooner than it did, CIGNA did not profit from the delay. For as CIGNA rightly points out, it is merely the Plan's claims administrator. It does not fund the benefit payments—American Family does—and so CIGNA did not stand to gain financially from the delay in reversing its original decision to deny Mondry's claim for benefits.

## III.

The district court correctly dismissed Counts One and Two of the complaint as to CIGNA. However, the court erred in entering summary judgment in favor of American Family on these counts. As to Count One, Mondry has established that American Family failed in its statutory obligation to produce plan documents to Mondry under section 1024(b)(4) and therefore is liable for statutory penalties under section 1132(c)(1). The material facts as to that count are not in dispute, and Mondry is entitled to summary judgment finding American Family liable for violating section 1024(b)(4). As to Count Two, Mondry has presented evidence from which the finder of fact could conclude that American Family violated its fiduciary obligation to her by failing to comply with its obligation under section 1024(b)(4). She is entitled to a trial on that count. We therefore reverse the district court's entry of summary judgment in favor of American

Family and against Mondry on Counts One and Two and remand with directions to enter summary judgment in favor of Mondry and against American Family on Count One and to determine appropriate statutory penalties, and to conduct such further proceedings as are appropriate as to Count Two. Mondry shall recover her costs of appeal from American Family.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.